IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

PEGGY L. MASSENGILL,

      Plaintiff,

v.                            No. 04-2956 B

SHENANDOAH LIFE INSURANCE COMPANY,

      Defendant.

_____

ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE RECORD
AND DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE RECORD
_____

The Plaintiff, Peggy L. Massengill, brought this action against the Defendant, Shenandoah Life Insurance Company ("Shenandoah"), alleging that the insurer wrongfully terminated long term disability ("LTD") benefits under a group disability insurance policy (the "Policy") issued by the Defendant in violation of the Employees Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Before the Court are the parties' cross motions for judgment on the administrative record.

In its motion, the Defendant first argues that Massengill's claim is time-barred. In so doing, Shenandoah relies on three provisions of the Policy. First, a full-time employee under the Policy is eligible for a 24-month benefit and will be considered totally disabled if,

during the elimination period and the next 24 months of disability [she] is:

1.      unable to perform all of the material and substantial duties of [her] occupation on a full-time basis because of a disability:

      a.      caused by injury or sickness;

      b.      that started while insured under this coverage; and

> 2.      after 24 months of benefits have been paid, the insured is unable to perform with reasonable continuity all of the material and substantial duties of [her] own or any other occupation for which [she] is or becomes reasonably fitted by training, education, experience, age, and physical and mental capacity.

(Admin. Rec. ("AR") at MASS0008)

> When the [insurer] receives proof that an insured is totally disabled due to sickness or injury and requires the regular attendance of a physician, the [insurer] will pay the insured a monthly benefit after the end of the elimination period.  The benefit will be paid for the period of total disability if the insured gives the [insurer] proof of continued:

> 1.      total disability; and

> 2.      regular attendance of a physician.

(AR at MASS0011)

> Second, benefits for disability on the basis of mental illness are limited as follows:

> Benefits for disability due to mental illness will not exceed 24 months of monthly benefit payments unless the insured meets one of these situations.

> 1.      The insured is in a hospital or institution at the end of the 24 month period. The monthly benefit will be paid during the confinement.

> If the insured is still disabled when [she] is discharged the monthly benefit will be paid for a recovery period of up to 90 days.

> If the insured becomes reconfined during the recovery period for at least 14 days in a row, benefits will be paid for the confinement and another recovery period up to 90 more days.

> 2.      The insured continues to be disabled and becomes confined:

> a.      after the 24 month period; and

> b.      for at least 14 days in a row.

> The monthly benefit will be payable during the confinement.

> The monthly benefit will not be payable beyond the maximum benefit period.

2

(AR at MASS0016)

Finally, the Policy provides that "[a] claimant . . . cannot start any legal action . . . more than three years after the time proof of claim is required."  (AR at MASS0026)  Proof of claim is defined thusly:

a.   Proof of claim must be given to the Company.  This must be done no later than 90 days after the end of the elimination period.

b.   If it is not possible to give proof within these time limits, it must be given as soon as reasonably possible.  But proof of claim may not be given later than one year after the time proof is otherwise required.

(AR at MASS0026)  The "elimination period" refers to "a period of consecutive days of total disability for which no benefit is payable.  The elimination period is shown in the application and begins on the first day of disability."  (AR at MASS0005)  The Defendant posits, and the Plaintiff does not dispute, that the elimination period relevant to this case was 180 days.  (AR at MASS0525)

Massengill applied for LTD benefits on July 8, 1997 due to inability to concentrate, memory problems, chronic pain and fatigue, listing the date she became disabled as May 16, 1997, the last date she worked.  (AR at MASS0534)  Thus, her 180-day elimination period expired on or about November 13, 1997.  Benefits were paid for 24 months, ending on January 4, 2000, when they were terminated on the grounds that she was no longer eligible therefor.

It is the Defendant's position that proof of claim, due 90 days after the end of the elimination period, was to have been provided to the employer by on or about February 11, 1998 or, if that were not possible, by no later than February 11, 1999.  Shenandoah argues that, as the Plaintiff, who instituted this lawsuit on November 23, 2004, failed to bring her legal action within three years of February 11, 1999, the last date on which proof of claim could have been timely submitted, the suit is out of time.

3

In response, the Plaintiff points to language contained in the Policy's General Provisions section stating that "[a]ny provision of this policy which, on its Effective Date, is in conflict with the statutes of the jurisdiction in which the insured resides on such date is hereby amended to conform to the minimum requirements of such statute" (AR at MASS0027), and submits that this provision must be construed in a light most favorable to her so as to restore the six-year statute of limitations provided for under Tennessee Code Annotated § 28-3-109. Under the statute, "[a]ctions on contracts not otherwise expressly provided for" must "be commenced within six (6) years after the cause of action accrued." Tenn. Code Ann. § 28-3-109(a)(3).

ERISA does not contain a statute of limitations provision governing claims for benefits under an ERISA plan.[1] As a consequence, courts have held that the appropriate limitations period is that of the state in which the claim was brought. See Meade v. Pension Appeals & Review Comm., 966

---

[1]In her complaint, Massengill alleged, in addition to wrongful termination of disability benefits, breach of fiduciary duty on the part of Shenandoah. Although ERISA does not provide a statute of limitations periods for denial of benefits claims, it does set forth a period within which breach of fiduciary claims must be brought. The statute provides that

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. 1113. As the parties make no mention of this statutory period in their motion papers, the Court assumes they are in agreement that any breach of fiduciary claims are not untimely.

4

F.2d 190, 194-95 (6th Cir. 1992).  "Courts have also recognized that in the ERISA context, as with other types of contractual arrangements, the parties may agree upon a shorter limitations period, so long as the period is not unreasonably short."  Jackson v. UNUM Life Ins. Co. of Am., No. 1:02-CV-507, 2003 WL 1142549, at *2 (W.D. Mich. Jan. 23, 2003) (citing Wilkins v. Hartford Life & Accident Ins. Co., 299 F.3d 945, 948 (8th Cir. 2002)); see also Northlake Reg'l Med. Ctr. v. Waffle House Sys. Employee Benefit Plan, 160 F.3d 1301, 1303-04 (11th Cir. 1998); Doe v. Blue Cross & Blue Shield United of Wis., 112 F.3d 869, 873-74 (7th Cir. 1997)).  A limitations period of three years has been held to be reasonable in cases involving disability policies.  See Wilkins, 299 F.3d at 948; Jackson, 2003 WL 1142549, at *2.

The conformity clause, that is, conforming conflicting policy wording to a state statute's language, does not trump the Policy's time-to-sue provision.  In Thomas v. Allstate Insurance Co., 974 F.2d 706 (6th Cir. 1992), the plaintiff argued that the defendant's insurance policy's time-to-sue language must be read in conjunction with another provision, virtually identical to that at issue here, stating that "[w]hen the policy provisions are in conflict with the statutes of the state in which the residence premises is located, the provisions are amended to conform to such statute."  Thomas, 974 F.2d at 709.  In rejecting the plaintiff's position, the court cited to Smith v. Allstate Insurance Co., Shelby Equity No. 34, No. 92364-Q, 1987 WL 30150 (Tenn. Ct. App. Mar. 28, 1987).  In Smith, the plaintiff contended, as does Massengill, that the Tennessee six-year statute of limitations for suits on contracts should apply instead of the policy's time-to-sue provision by virtue of the Allstate[2] policy's conformity clause.  Smith, 1987 WL 30150, at *1.  The court found as follows:

While the limitation period as provided for in the policy is different from that

---

[2]The Allstate conformity provisions before the court in Smith and Thomas were identical.

provided for by the statutes of this state, they are not "in conflict." The law in Tennessee is simply to the effect that absent an agreement to the contrary, any aggrieved party has six years to sue for the enforcement of a contract. The crux of the holding of [cases upholding contractual periods of limitation in insurance contracts having the effect of reducing the statutory period for filing suit] is to the effect that parties may contract themselves out of the six-year period, and this is what has taken place here. Language pertaining to conformity is obviously in the insurance contract to accommodate any jurisdiction that may have a statutory provision prohibiting language in an insurance contract restricting the time in which suit might be filed.

Id.; accord Sharp v. Allstate Ins. Co., Obion County No. 02A01-9204-CV-00107, 1992 WL 289660, at *2 (Tenn. Ct. App. Oct. 16, 1992) (same); see also Franklin v. Cont'l Assurance Co., No. 85 C 9735, 1989 WL 84317, at *1 (N.D. Ill. July 18, 1989) ("'Legal action' clauses that are reasonable will be enforced even if the time period is less than that prescribed by the state's statute of limitations and even if the policy contains a 'conformity with state statutes' provision"); Hawkins v. Heritage Life Ins. Co., 973 S.W.2d 823, 826 (Ark. App. 1998) (holding that insurance policy's conformity provision did not waive the policy's shorter contractual limitation, recognizing that "parties in Arkansas have the right to contract for something less than the statutory . . . limitation period").

Finding Smith's reasoning persuasive, the Thomas court characterized the policy's conformity provision as "simply emphasiz[ing] that parties cannot contract to do that which the state legislature has forbidden." Thomas, 974 F.2d at 709. For example, "if [Tennessee] had a statute that clearly prohibited parties from shortening the time in which a party could bring suit on a contract, then any provision in the contract that purported to shorten a statute of limitations would be resolved in favor of the statutory limitation." Id. Massengill has pointed to no such statute in Tennessee.

That said, the crux of the matter in this case appears to be when the Plaintiff's cause of action actually *accrued*. It is the Defendant's position that, according to the Policy language, the three-year limitations period began to run, and the cause of action accrued, when "proof of claim [was]

required," which, in this case, would have been no later than February 11, 1999.  However, "[w]hen

an ERISA claim is governed by a state statute of limitations, the cause of action accrues, for

limitations purposes, when the plan administrator formally denies the claim for benefits, unless there

is a repudiation by the fiduciary which is clear and made known to the beneficiary."  Wilkins, 299

F.3d at 948-49 (citation and internal quotation marks omitted); see also Morrison v. Marsh &

McLennan Cos., Inc., 439 F.3d 295, 302-03 (6th Cir. 2006) (citing Wilkins with approval); Jackson,

2003 WL 1142549, at *2.

There was no repudiation by the fiduciary in this case.  When her disability benefits were

terminated, the Plaintiff pursued appeal and review of the decision.  Shenandoah does not aver that

her appeals were untimely or that she failed to cooperate in the conduct of the Defendant's review.

On February 6, 2002, the Defendant issued a letter to Massengill's counsel, which stated in pertinent

part as follows:

> We have received and reviewed the additional medical records you submitted on
> December 7, 2001 concerning Ms. Massengill's claim for Long Term Disability
> benefits.
>
> The additional medical information was reviewed by Donald Abbott, M.D. the same
> consulting physician that previously reviewed Ms. Massengill's claim.  Dr. Abbott
> concluded that this medical information does not provide any new information to
> reverse his previous opinion that the medical data does not support a medical
> condition of the severity to precluded Ms. Massengill from performing the
> alternative occupations we identified in our prior correspondences.
>
> To date, we have provided multiple reviews of Ms. Massengill's claim for Long
> Term Disability benefits.  Consequently, it is our determination that Ms. Massengill
> has exhausted all administrative remedies under the Policy.
>
> As a result of this adverse benefits determination on this claim, if Ms. Massengill
> disagrees with our final decision on appeal she has additional appeal rights,
> [including suit] in federal . . . court.

(AR at MASS0041)  Therefore, the date on which the insurer "formally denie[d] the claim for

7

benefits" occurred on February 6, 2002.  If the Defendant's calculation of the limitations period is correct, Massengill would have had five days in which to initiate a lawsuit.

In support of its position, Shenandoah refers the Court to Clark v. NBD Bank, 3 F.App'x 500, 503-04 (6th Cir. 2001), in which the court upheld the lower court's adherence to the three-year contractual limitation period.  The case is unpersuasive, as it does not specifically address the issue of accrual and the court placed particular importance on the undisputed fact that the plaintiff therein was not diligent in pursuing her rights, which is not a factor in this case.

In light of the Sixth Circuit's holdings to the effect that an ERISA claim accrues when the plan administrator formally denies the claim for benefits, this Court finds that Massengill's claim accrued on February 6, 2002 and that, accordingly, her action filed November 23, 2004 was timely, notwithstanding Policy provisions to the contrary.  The Court finds of particular assistance in rendering its decision the concerns voiced by the court in White v. Sun Life Assurance Company of Canada, No. Civ.1:04CV80, 2005 WL 1926566 (W.D.N.C. Aug. 11, 2005) when faced with a similar question:

> If the Court were to instead apply the accrual date found in the provisions of the plan, the Plaintiff here would have three years from the date the proof of loss was required to be filed to initiate her legal claim.  Under well settled law, however, a plaintiff is not permitted to file a claim until she has exhausted all administrative remedies, and a plaintiff will not be deemed to have exhausted all of her administrative remedies until the appeal of her initial benefit determination has been formally denied.  Therefore, if the contractually set accrual date were applied, there would exist a period of time between the Plaintiff's filing of a proof of loss and the time in which her benefits are formally denied during which the statute of limitations is running, but she is unable to file a claim.  The Court believes this particular application of contractually set accrual dates demonstrates the impropriety of the Defendant's argument.  The use of contractually set accrual dates would compress the time period within which a plan participant may actually file a legal claim.  This compression is also exacerbated given the complicated and time consuming nature of ERISA administrative appeals processes.  Though somewhat unlikely, if the period of time to exhaust administrative remedies was extremely protracted, using

8

the contractually set accrual date could result in a complete loss of the ability to file
a claim under the terms of the plan.

White, 2005 WL 1926566, at *3 (internal citations omitted).  That result very nearly occurred here.

Moreover, the White court recognized that

permitting contractually set accrual dates also opens the process up to potential abuse
by plan providers.  Plan providers could intentionally set early accrual dates while
delaying the formal denial of benefits, severely compressing the opportunity within
which a beneficiary may file a suit regarding her benefits.

Limiting a beneficiary's access to the courts and creating opportunities for abuse by
plan providers in such a way is also inconsistent with Congress' expressed intentions
in creating ERISA.  ERISA was instead intended to "protect . . . the interests of
participants in employee benefit plans and their beneficiaries . . . and provide for
appropriate remedies, sanctions, and ready access to courts.

Id. at *4 (internal citations and quotation marks omitted).

<u>MERITS OF PLAINTIFF'S CLAIM</u>

Findings of Fact.

The Plaintiff was born in 1953.  She is a registered nurse and was last employed in 1997 as

a home health care nurse by Elk Valley Professional Associates.  She was covered under the Policy,

which was administered by Shenandoah.  During her employment, she apparently had available to

her an aide who could assist her in heavy lifting.  According to the medical records contained in the

administrative record, she was diagnosed variously over a period of some years as suffering from

systemic lupus erythematos, osteoarthritis, psoriatic arthritis, fibromyalgia and chronic fatigue

syndrome.  The medical records also noted depression, which the Plaintiff claims was secondary to

her physical problems.  Diagnostic testing included a negative EMG, negative EEG, negative MRI

of the head, evidence of degenerative joint disease in MRI of the cervical and lumbar spine, elevated

ANA and normal sed rate.  (AR at MASS0287).  X-rays performed in June 1997 revealed a

narrowed C5-6 disc space and some osteophyte formation with protrusion into the neural foramina. (AR at MASS0446)  X-rays of the cervical spine conducted two years earlier had the same results. It was noted in the x-ray report that the degenerative changes resulted from a whiplash injury.  (AR at MASS0447)  These changes indicated in the cervical area have been described by Massengill's neurologist as "fairly unimpressive."  (AR at MASS0491)

In 1995, Dr. Robert Mandle recalled in his progress notes a long discussion with the Plaintiff concerning past sexual abuse, for which she refused counseling based on a negative experience.  She also reported lack of libido.  At the time she was taking Serzone, which she believed was helping. (AR at MASS0474)  In 1997, Massengill reported morning stiffness and fatigue, along with stress due to having recently built a house with her husband and moved in.  (AR at MASS0476)  The physician noted after an office visit later in 1997 that she was "just about to come unglued, cried constantly, feared losing her job, and stated she didn't "feel like doing anything."  He diagnosed major depression and prescribed a low dose of Paxil, an antidepressant.  Dr. Mandle recalled in  his notes that he "tried to talk to her and tell her that she [was] depressed, but she [didn't] feel that she [was]."  (AR at MASS0475)  She was later placed on Prozac instead to avoid weight gain.  The medications were apparently refilled without follow-up or psychiatric referral.

The Plaintiff presented to Dr. Glen Barnett in June 1997 complaining of pain, fatigue, memory lapses, getting lost and inability to concentrate.  (AR at MASS0489)  His examination was unremarkable other than the appearance of sadness.  (AR at MASS0489-0490)  Dr. Barnett referred Massengill to a neurologist for evaluation of her mental difficulties.  (AR at MASS0490)

A month later she was examined by Dr. Karl Misulis, a neurologist, who indicated in his progress notes that the Plaintiff "describe[d] diffuse weakness and fatigue and actually asked about

fibromyalgia."  (AR at MASS0491)  His initial examination revealed probable fibromyalgia with some elements of depression.  The Paxil dosage was increased.  (AR at MASS0491)  Her condition at a follow-up visit in August 1997 was unchanged.  (AR at MASS0492)

Dr. Trev Sprabery, a rheumatologist, examined Massengill on August 22, 1997 regarding complaints of fatigue and general pain in the arm, chest, shoulder, neck, feet and fingers.  She reported loss of strength, clumsiness, and daily morning stiffness.  (AR at MASS0195)  He noted no limitation on range of motion or evidence of synovitis.  There was, however, tenderness around the shoulders, along with the presence of trigger points.  The initial impression was possible fibromyalgia or systemic lupus.  (AR at MASS0194-0195)  Dr. Sprabery completed a functional capacities form at the request of Shenandoah in December 1997, in which he estimated that Massengill could sit, stand or walk no more than zero to two hours in an eight-hour workday, could occasionally lift up to 10 pounds but never more than that and should not grasp or manipulate with either hand, based on "tenderness in joints and episodes of swelling." (AR at MASS0521)  Whether she could work, he opined, depended on the limitations referenced in the form.  (AR at MASS0521)

At about this time, Shenandoah benefits specialist Linda Bousman reported in an internal memorandum that Massengill informed her in a telephone conversation that "she will never be able to return to any work" and that "her doctors said she will only get worse."  The Plaintiff further advised Bousman that "she stays in pain and is unable to do anything but sit or lay around.  She said she is very slow, she hurts, she can't think and can't remember things.  She does not have any future plans.  She said on days she feels a little better she tries to do light housework but it takes her all day."  Bousman remarked, however, that "she sounded very cheerful, very normal, not like anyone who was in pain."  (AR at MASS0524)

In October 1997, Massengill's family physician, Dr. James H. Smith, submitted to the insurer an attending physician's statement offering a diagnosis of systemic lupus erythematos complicated by psoriasis and fibromyalgia.  It was his opinion that she was incapable of sedentary work and was totally disabled from her previous work or any other work.  He further indicated that her condition would not improve and that she would never be able to work.  Objective findings in support of the opinion were "lab positive for double stranded DNA has all [signs and symptoms] related to lupus has all signs/symptoms fibromyalgia all tender points positive."  Dr. Smith also remarked that Massengill was unable to function safely and adequately in her position as a nurse due to pain and stress, causing her to be unreliable and inaccurate.  He made no mention of her ability to perform any other type of job.  (AR at MASS0528-0531)

In May 1998, consultative physician Richard Herman reported that he was uncertain based on the medical records whether the Plaintiff suffered from lupus, noting that an elevated ANA "does not verify the diagnosis of lupus."  In any case, he added, lupus on its own would not necessarily preclude Massengill from performing sedentary to light work in an appropriate setting, depending on her symptoms.  (AR at MASS0429)  Dr. Herman also submitted that, while the Plaintiff showed some signs of fibromyalgia, which could co-exist with lupus, he was unable to locate in the medical records information concerning the "trigger points" for the disease, which are key to formulating a diagnosis.  It was Dr. Herman's opinion that, even with fibromyalgia the claimant could perform sedentary to light work if she were permitted to pace herself.  (AR at MASS0429)

With respect to chronic fatigue and pain, Dr. Herman related that, while the Plaintiff alleged cognitive difficulties, the brief neurological evaluation performed by Dr. Misulis revealed no gross memory impairment.  It was further pointed out that no neurological testing had occurred.  The

consultative physician opined that the claimant might, nonetheless, be capable of sedentary or light work in the absence of significant stress.  (AR at MASS0430)  It was Dr. Herman's opinion, based on Dr. Mandle's notes, that depression was the most likely diagnosis; however, he recognized that "[i]t is not unusual for patients with Major depression to experience somatic pain in various parts of their body.  It is also not unusual for patients with chronic illness to suffer secondary depression so it is often difficult to sort out which came first."  (AR at MASS0430)  In sum, he concluded that it was unclear from the evidence if Massengill suffered from primary depression or depression secondary to lupus, or for how long the depression may have lasted after the initial diagnosis in 1997.

(AR at MASS0430)

> On June 16, 1998, Dr. Sprabery offered the following opinion to Shenandoah:
>
> Mrs. Massengill is a patient that I am following for an inflammatory arthritis.  We have not specifically diagnosed this as systemic lupus erythematosus.  She does have psoriasis and what is consistent with an inflammatory arthritis.  As you are aware, a sedimentation rate does not have to be elevated to have rheumatoid arthritis, lupus, psoriatic arthritis or any other specific form of arthritis.  This is a reflection of an inflammatory state but is not consistently elevated in these conditions.  Due to the persistent discomfort in her joints and her significant morning stiffness and response in the past, to a brief trial of Methotrexate, we have felt that she does have an inflammatory arthritis.
>
> She has had positive anti-nuclear antibodies in the past as well as moderately positive double stranded DNA.  The double stranded DNA was negative in follow-up.  As you can tell, she is not just a simple case of "arthritis."  She is experiencing enough difficulty in her joints at this time to feel that she does desire to proceed with . . . fairly aggressive therapy.  The primary reason that she is having difficult [sic] working is due to, as stated, the significant stiffness that she is experiencing in the mornings and joints [sic] pains are worsened with use.

(AR at MASS0428)

> At the request of the Defendant, Dr. Smith also completed an estimated functional capacities

form and mental status supplemental questionnaire, which contained essentially the same limitations indicated by Dr. Sprabery.  (AR at MASS0440)  It was Dr. Smith's position that she could not work and that she was disabled because, according to the Plaintiff, she suffered severe pain that interfered with her thought process and even light activity made the pain worse.  He assumed the depression was secondary to her physical problems.  (AR at MASS0440-0441)  In rendering his opinion, Dr. Smith conceded that he estimated the claimant's functional capacity "by asking her the questions about her ability to perform."  (AR at MASS0439)  In addition, he recounted that, at one office visit in 1998, Massengill told him another doctor had told her she would never be well and never return to work.  (AR at MASS0445)  When asked by Shenandoah if he believed a psychiatric referral would be helpful, he replied in the affirmative.  (AR at MASS0445)

Dr. Misulis advised Shenandoah in a letter dated June 25, 1998 that "fibromyalgia is a 'rule out' diagnosis and is not a specific disease and basically represents a chronic pain syndrome in the absence of objective findings on laboratory testing and examination findings."  (AR at MASS0405) He reported finding no objective evidence of a cognitive disorder and opined that depression was the "most likely diagnosis," adding that psychiatric care may be more helpful to the Plaintiff than medical care.  (AR at MASS0406)  Dr. Misulis generally concurred with Dr. Herman's report.  (AR at MASS0418)

In a rehabilitation survey completed by the Plaintiff in July 1998, she related that she stayed in bed 75 percent of the time, did light housecleaning and cooked meals approximately four times per week.  She denied being able to return to work or to explore work activities.  (AR at MASS0415)

Massengill's December 1997 application to the Social Security Administration (the "SSA") for disability benefits was denied in February 1998 on the grounds that the lupus, fibromyalgia,

psoriasis and neuritis were not sufficient to seriously limit her activities and that, even with mental problems, she was able to communicate with others, act in her own interest and perform most ordinary activities.  (AR at MASS0483-0484)  Based on the reports of her physicians, it was concluded that, although her impairments kept her from doing her past work, they did not preclude her from performing jobs that were less demanding.  (AR at MASS0484).  Following the Plaintiff's request for a hearing, the SSA issued an opinion finding disability appropriate based on depression and stating that "[e]ven if the claimant did not meet the requirements [for disability on the grounds of depression], she could not perform a full range of work at any exertional level."  (AR at MASS0395)

Dr. Sprabery submitted another opinion on September 4, 1998, stating that

She has had a positive antinuclear antibody and double-stranded DNA in the past; however, I have been concerned that her arthritic complaints have arisen possibly from her psoriasis.  She does not necessarily have to have an elevated ESR to have arthritis.  I have no idea [of] a target date for her return to work from my standpoint. She has had tenderness in  her joints on times with some slight synovitis on exam. She had what appeared to be a potential response to methotrexate; however, we are awaiting further evaluation of her liver status before proceeding with methotrexate since psoriatic patients are at an increased risk for psoriasis from this medication. She has had injections in her joints with some response.  We are hopeful that once we begin the methotrexate therapy, she may begin to see some improvement in her joint complaints.  Again, I have not felt her complaints were related to depression. She does have a normal ESR, but patient's [sic] with systemic lupus erythematosus and other arthritic conditions also have had normal ESR's.  I do not think that a diagnosis of exclusion of a diagnosis can be related to a nonspecific test such as this.

(AR at MASS0378)

According to progress notes from 1998, Dr. Sprabery noted tenderness in the right shoulder in May of that year and again in August.  During the latter office visit, he indicated that Massengill had gone on vacation with pain recurring thereafter and had played golf, which aggravated the shoulder.  He reported fairly good range of motion but with discomfort, no specific areas that were

15

more tender than others, and no warmth.  (AR at MASS0188)  Progress notes from 1999 revealed

reports of pain in the hands, feet and ankles, which improved; foot pain on getting out of bed; lower

back and neck pain; joint pain and swelling.  (AR at MASS0180, 0182, 0186)

In September 1999, Dr. Sprabery responded to an inquiry from MainCare, a consultant asked

by Shenandoah to review Massengill's file.  This was apparently precipitated by a June 1999 request

by the Plaintiff's counsel to change the primary diagnosis from mental to physical and to extend the

duration of her benefits. (AR at MASS0340)  The physician responded thusly:

> Mrs. Massengill is currently being treated for rheumatoid arthritis which I felt most
> consistent with psoriatic or rheumatoid arthritis.  Current recommendations in
> rheumatology to prevent joint destruction is early disease modifying drug use.
> Methotrexate therefore, would not be considered an overly aggressive approach but
> actually an appropriate approach to her situation.  On a number of exams, she has
> had inflammation in her joints manifest by swelling and tenderness.  As a Board
> Certified Rheumatologist, I feel that at the present time she is on the most
> appropriate therapy for her arthritis and feel that her difficulty in working is related
> to her joint status.

(AR at MASS0325)

MainCare case manager Wendy Coyne disagreed with Dr. Sprabery's assessment,

questioning his lack of documented physical findings, particularly with respect to his use of

Methotrexate, an extremely aggressive treatment used in only severe cases.  (AR at MASS0331-

0334)  She further indicated that "[m]any of [Massengill's] symptoms are frequently seen with a

diagnosis of depression.  These symptoms can include a multitude of somatic complaints such as

physical aches and pains, headaches, inability to concentrate, poor memory and fatigue."  (AR at

MASS0334)  With respect to the ANA results, Coyne recognized that "this can be abnormal for a

variety of reasons and in the absence of other findings such as negative rheumatoid factor or normal

sed rate, may actually be an incidental factor."  (AR at MASS0327)  It was also observed that the

16

Plaintiff "appear[ed] well entrenched in the 'disability mindset.'" (AR at MASS0331) Coyne pointed out that Massengill herself was the "primary source of her restrictions" and that "[h]er physicians have relied heavily on her assessment of whether she can work or not, as well as her assessment of her own condition." (AR at MASS0334) It was the consultant's determination that, based upon the medical information provided and the lack of objective findings, it appeared the Plaintiff was able to perform the essential duties of her job as a home health nurse and recommended a psychiatric IME [independent medical examination][3] to assess whether depression was in fact the primary disabling condition and evaluate treatment options such as changes in medication and counseling. (AR at MASS0335)

As of November 13, 1999, the Plaintiff had received disability payments under the Policy for 24 months. Pursuant to the total disability clause set forth above, in order for total disability to continue after two years, a claimant had to be "unable to perform with reasonable continuity all of the material and substantial duties of [her] own or any other occupation for which [she] is or becomes reasonably fitted by training, education, experience, age, and physical and mental capacity." (AR at MASS0275) On December 10, 1999, Richard Spies, Senior Managed Disability Analyst for Disability Reinsurance Management Services, Inc., requested that Sarah Lawsure, a registered nurse and consultant, review Dr. Sprabery's progress notes, relating that it appeared the claimant has "substantiated physical problems" and that Shenandoah was currently paying for mental

---

[3]An IME, as the term suggests, permits a physician to "conduct his own examination and to reach his own conclusions." Kleffman v. Reliance Standard Life Ins. Co., No. C04-5430FDB, 2005 WL 1383964, at *2 (W.D. Wash. June 8, 2005).

illness disability which was to expire in November 1999.[4]  He queried whether the medical records

supported a transfer of benefit payments from mental to physical.  (AR at MASS0320)  Pursuant to

the request, Lawsure reviewed Massengill's file in December 1999 and, as part of that review, spoke

with Dr. Sprabery on the telephone.  According to the Defendant, it was agreed in the conversation

that Massengill had at least sedentary capacity[5] in a job in which she could change positions as

needed and have a flexible work schedule.

On December 29, 1999, Lawsure faxed a synopsis of the conversation to Dr. Sprabery for

his review and comment, which stated in pertinent part as follows:

> You advised that you have been treating Ms. Massengill for some time now.  The
> diagnosis you feel is appropriate, in this case, is Inflammatory Arthritis.  You noted
> that this is solely based on signs and symptoms not by objective testing results. . . .
>
> We discussed the possibility of other factors impairing Ms. Massengill, specifically
> -- weight & depression.  You advised that she still has extremity pain/swelling and
> both depression and increased weight would not result in such symptoms.  Additional
> objective testing would not confirm or dispute your diagnosis.  Thus, we ruled out
> the chance of further testing for diagnostic confirmation.   Lastly, another
> Rheumatology consult would possibly be inconclusive due to the "soft" findings, to
> date.
>
> I advised, per our file information, Ms. Massengill was formerly a Home Health
> Nurse (RN) with the ability to have an assistant available for the more physical
> demands of her occupation.  Currently, we are accessing [sic] whether Ms.
> Massengill would be able to perform another occupation.  Again, we would like to
> consider what she can do, NOT what she can not do based on signs and symptoms.
>
> Based on the information that has been provided, one would come to the following
> conclusion.  Ms. Massengil [sic] would be able to, at least, perform a sedentary type

---

[4]This would appear to belie the Plaintiff's contention that Shenandoah was looking for
any basis upon which to deny her benefits.

[5]"Sedentary" work is defined as "the ability to exert force to 10 lbs. occasionally or a
negligible amount of force frequently to lift, carry, push, pull, or move objects."  (AR at
MASS0288)

position where she could change positions as needed and be flexible (time-wise) if
her symptoms dictated.

(AR at MASS 0308)  The correspondence advised Dr. Sprabery that, if he did not reply by January

10, 2000, "we will assume you agree she would be able to perform a sedentary occupation in a

flexible environment where she could change positions as needed."  (AR at MASS0308)  The

Defendant insists, and the Plaintiff does not deny, that Dr. Sprabery received the letter and that he

did not reply.  According to the internal notes of Shenandoah, which Massengill does not dispute,

the insurer telephoned Dr. Sprabery's office on at least one occasion concerning the status of his

review of the letter.

In an internal e-mail dated February 20, 2000, vocational rehabilitation consultant Lisa

Bossardt suggested that Massengill would benefit from returning to work even though she appeared

to oppose the idea.  (AR at MASS0296)  She also noted that the Plaintiff's symptoms of depression

are associated with many disease processes and, as such, may make it "difficult to sort out which

element is the current precipitating factor."  In any case, it was Bossardt's opinion that neither

Massengill's physical nor mental problems warranted a finding of total disability for any occupation.

(AR at MASS0296-0297)  A vocational analysis report issued by Bossardt on February 19, 2000

noted Dr. Sprabery's disabling diagnosis of inflammatory arthritis and his functional capacity

evaluation of December 1999, which suggested the ability to perform sedentary duty with position

changes as needed and flex-time.  (AR at MASS0287-0294)


On May 23, 2000, the Defendant issued a letter to the Plaintiff informing her that "the

medical information in your file no longer supports total disability as defined by the [P]olicy."  (AR

at MASS0275).  It was explained in the letter that, based upon the restrictions and limitations on

19

sedentary duty imposed by Dr. Spraberry as of December 29, 1999, she could, according to the vocational assessment, perform the duties of a nurse consultant, office nurse, medical office manager, office coordinator, admissions clerk, clinic clerk, medical clerk, receptionist, reception clerk, insurance-claim approver, insurance claim auditor, collections clerk and delinquent account clerk.  All of these jobs were identified by the vocational analyst as "sedentary duty" with the exception of office nurse, for which it was noted that, while it was classified as "light duty," some positions in that category required only sedentary duty.  (AR at MASS0292)  Further liability was denied effective November 13, 1999.  (AR at MASS0275-0276)

Additional reports were submitted by the Plaintiff in appealing the insurer's decision.  In September 2000, Dr. Robert W. Kennon, Ph.D., performed a psychological evaluation in which he noted that she was a "relatively bright individual" and that her numerous physical difficulties and depression tended to exacerbate one another.  He further opined that the prognosis for these patients is not positive, as the physical and mental features work together in a downward spiral.  The psychologist observed that Massengill was "prone to over interpreting some of her pain symptoms and experiencing difficulties on a much more broad basis than would be expected given her objective complaints."  (AR at MASS0164)  Dr. Kennon reviewed the occupations Shenandoah deemed the Plaintiff capable of performing and rejected each, citing strength deficits and chronic pain, as well as limited attention span and difficulties in maintaining concentration, resulting from moderate depression.  (AR at MASS 0159-0167)  He expressed doubt that an employer would hire someone who had to take the frequent breaks recommended by Dr. Sprabery.  (AR at MASS0159-0167)

Dr. Sprabery's progress notes from 2000 reveal shoulder, arm and thumb pain; "achy" joints;

good and bad days; occasional neck pain and morning stiffness.  His patient also reported that sitting

or standing and walking for long periods caused pain.  (AR at MASS0214, 0174-0179)

In August 2001, Dr. Barton Chase, her primary care physician, opined in a residual

functional capacity questionnaire that she suffered from chronic pain syndrome and hypothyroidism,

citing pain that varied from day to day which was frequently severe enough to interfere with

attention and concentration.  (AR at MASS0134)  According to his evaluation, she was able to sit,

stand or walk less than two hours in an eight-hour workday, was incapable of even low stress work,

could rarely hold her head up, could use her hands and fingers for repetitive work only 10 percent

of a workday; must be able to walk and move about frequently during the workday, could rarely lift

less than 10 pounds and never more weight, and could not twist, bend, crouch or climb.  It was Dr.

Chase's opinion that she needed a job that permitted her to shift positions when necessary.  He

estimated that she should walk every 30 minutes for 10 minutes at a time.  Massengill was not

viewed by the physician as a malingerer.  (AR at MASS0135)  Progress notes from office visits in

2000 and 2001 document complaints of arthritis, stiffness, muscle pain, backache, tenderness and

depression.  Physical examination was unremarkable.  (AR at MASS0105-0114)

In a September 7, 2001 report prepared at the request of the Plaintiff's attorney, Certified

Rehabilitation Counselor Nancy Hughes opined that Massengill's subjective complaints were

consistent with the later reports of Drs. Sprabery and Chase.  Therefore, she could not return to her

past work which called for more physical and mental abilities than she possessed.  Nor could she

perform the jobs listed in the insurer's letters, "all of which fell in the skilled or semi-skilled, light

to sedentary categories."  (AR at MASS0137-0140)  The counselor stated that

> [h]er physical limitations would preclude her from all employment, especially
> unskilled work which does not require as much concentration as skilled or semi-

> skilled work.  Her lack of stamina to endure a full day's work or work on a consistent basis would also preclude her from unskilled, sedentary even part time jobs. Unskilled jobs are those which would also require structure in the work environment and do not afford the opportunity to sit or stand "at will."  Unskilled jobs typically require repetitive use of the hands and arms, something Ms. Massengill cannot perform.  Ms. Massengill is also likely to miss work more than four times a month which would preclude her from sustaining even a part time job.

Rather, Hughes concluded, "Massengill has a debilitating illness which has significantly reduced both her physical and mental functioning."  (AR at MASS0137-0140)

A consultative report was submitted to Shenandoah on October 31, 2001 by Dr. Donald Abbott, who noted that the tests revealing elevated ANA and double stranded DNA were nonspecific tests and that x-rays had been rather benign and failed to show erosive joint disease typical of inflammatory arthritis or any other problem.  Examinations by Dr. Sprabery showing mild synovial thickening and swelling were, in his opinion, unimpressive.  (AR at MASS0120)  He further noted significant psychological issues, with depression being treated with low-dose antidepressants.  While the consultative physician recognized, based on Dr. Kennon's report, that Massengill may not have the capacity to work because of psychological issues at the time of his report, it did not contain any support that she was being treated for psychological problems at the time benefits were terminated. (AR at MASS0120).

After numerous reviews, all appeals to the insurer were denied.  Following her exhaustion of Shenandoah's appeals process, this action ensued.

<u>Conclusions of Law.</u>

"A denial of benefits . . . is to be reviewed under a <u>de</u> <u>novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  <u>Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston</u>, 419

F.3d 501, 505-06 (6th Cir. 2005), reh'g and reh'g en banc denied (Oct. 21, 2005).  Both parties agree

that the de novo standard is appropriate here.   Under this standard, the Court is to review the

administrator's decision "without deference to the decision or any presumption of correctness, based

on the record before the administrator."  Perry v. Simplicity Eng'g, 900 F.2d 963, 966 (6th Cir.

1990).  "[T]he court must determine whether the administrator properly interpreted the plan and

whether the insured is entitled to benefits under the plan."  Hoover v. Provident Life & Acc. Ins. Co.,

290 F.3d 801, 809 (6th Cir. 2002).  That is, the Court "simply decides whether or not it agrees with

the decision under review."  Perry, 900 F.2d at 966.

        The Plaintiff argues in this case that Shenandoah categorized her claim as one for disability

benefits due to a mental illness--depression--rather than to a physical infirmity--chronic pain

syndrome--in order to invoke the 24-month mental illness limitation contained in the Policy which

resulted in the termination of benefits at the end of two years in 1999.[6]  In so doing, Massengill

insists, the Defendant either ignored or twisted the opinions of her physicians that her primary

condition was physical, in keeping with its intention to avoid extended liability for benefits.  In

response, it is the Defendant's position that its determination that Massengill suffered primarily from

a mental disability is supported by the record.  The insurer further posits that, even if the primary

disability were physical, there were no objective findings to support a conclusion that the Plaintiff

was "totally disabled" under the Policy when benefits were terminated, which would have entitled

her to benefits beyond the 24-month period ending in late 1999.  The position of Shenandoah in

summary is that, even if Massengill suffered from mental illness for more than 24 months, she could

_____

        [6]Shenandoah continued, however, to make disability payments to the Plaintiff under the
Policy until January 4, 2000.

not receive benefits after the 24-month payment period that expired November 13, 1999 pursuant

to the Policy's mental illness limitation provision.  It is also argued by the insurer that the medical

records do not reflect or support a conclusion that she is unable to perform *any* work, as is required

under the Policy to continue benefits after the 24-month disability period.

It is clear from the language of the Policy that Massengill has received all the benefits based

on mental illness to which she is entitled under the Policy and that she was no longer eligible

therefor after November 1999.  The only question is whether she was totally disabled from working

under the "any occupation" provision subsequent to that date.  Based on a careful reading of the

record, the Court finds that the Plaintiff was not entitled to an extension of benefits.

At the outset, the Court recognizes that chronic pain syndrome and fibromyalgia are difficult

to diagnose and not conducive to objective medical testing.  See Green v. Prudential Ins. Co. of Am.,

383 F.Supp.2d 980, 997 (M.D. Tenn. 2005); Robyns v. Reliance Standard Life Ins. Co., No. IP 98-

1241-CH/K, 2003 WL 21850820, at *1 (S.D. Ind. July 10, 2003).  It is significant, however, that,

with the exception of Dr. Smith, none of the Plaintiff's doctors, including Dr. Sprabery, upon whose

opinions she urges the Court to rely, opined that she could not perform sedentary work where she

could change position.  Even though she characterizes the December 29, 1999 letter from

Shenandoah to Dr. Sprabery as an attempt to change his opinion "by the device of assuming his

agreement in the opinions of [the insurer's] consultants," the fact is that the letter is not inconsistent

with Dr. Sprabery's earlier findings.  Nor does she offer any explanation whatsoever for why he did

not respond to the letter.  It simply appears that he agreed with its contents and was willing for the

Defendant to assume, based on his non-response, that he concurred with the conclusion contained

therein.  For his part, Dr. Smith admitted in his opinion that Massengill could not work based on her

answers to questions concerning her ability.  His statement in this regard, couched almost in the form of an excuse, hardly amounts to a ringing endorsement of the assessment.

Furthermore, even though Dr. Kennon remarked that, from a realistic standpoint, no employer would want to hire the Plaintiff based on her need to get up and move about often, "[c]ourts have repeatedly upheld administrative claim denials where medical evidence indicates that shifting position as needed would enable the claimant to perform sedentary work." Richards v. Hartford Life & Acc. Ins. Co., 356 F.Supp.2d 1278, 1287-88 (S.D. Fla. 2004), aff'd, 153 F.App'x 694 (11th Cir. 2005) (rejecting argument that "no employer can make such an accommodation").

Moreover, eligibility determinations by the Social Security Administration are not binding on the district court.  Cook v. Liberty Life Assurance Co. of Boston, 320 F.3d 11, 16 n.5 (1st Cir. 2003); Richards, 356 F.Supp.2d at 1288.  Nor is it required that the opinions of treating physicians be accorded special deference.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 823-25, 123 S.Ct. 1965, 1966-67, 155 L.Ed.2d 1034 (2003) ("plan administrators are not obliged to accord special deference to the opinions of treating physicians," resolving a split in the circuit courts); Connors v. Conn. Gen. Life Ins. Co., 272 F.3d 127, 135 n.4 (2d Cir. 2001) (the "treating physician rule," a standard developed in the Social Security context requiring the factfinder to "give greater deference to the expert judgment of a physician who has observed the  patient's medical condition over a prolonged period of time," was "designed to encourage the development of the administrative record so that the district court can determine whether the administrator's decision was supported by substantial evidence . . . serves no particular purpose in the context of de novo review").

A reading of the entire record leads the Court to conclude that, while Massengill suffers from a physical condition, it is not one that renders her totally disabled from any occupation.  To the

extent this condition is complicated by psychological issues, she has received the limit of compensation therefor under the Policy.  Accordingly, the Defendant's motion for judgment on the pleadings is GRANTED and the motion of the Plaintiff is DENIED.  Further, based on its ruling, the Court finds that Shenandoah did not breach its fiduciary duty to the Plaintiff.

IT IS SO ORDERED this 28th day of September, 2006.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE